Case No. 13-7198 et al. Howard Town Center Development LLC Appellant v. Howard University v. Castle Rock Partners LLC Appellant Mr. Smierczynski for the Appellant, Mr. McCormick for the Appellate May it please the Court, Ken Smierczynski for Appellant, Howard Town Center Developer LLC and Castle Rock Partners LLC In 2010, in the midst of the worst commercial real estate environment in nearly a century, Tennent and Howard University agreed to a 99-year lease and associated development agreements for the development of a large mixed-use project in the Shaw neighborhood of D.C. Execution of major projects such as this take time. There are inevitable delays along the way and disputes about who is responsible for those delays, whether the landlord or the tenant. On April 6, 2012, the parties entered into a written agreement amending their obligations. That was the term sheet. That's what predecessors before the district court said was immaterial. Your Honor, it's true. They had a fallback position to that, but they didn't say it was immaterial. They argued it in the alternative. And in a footnote, page 21, footnote 16 of their opposition brief, they argued based on the term sheet. I'd also say the record shows they made the arguments that there was an agreement without referencing the term sheet. They were reticent because they treated it as a confidential document. They shouldn't have been. But nonetheless, the term sheet was there. The trial court looked at it and considered it. And the term sheet is important. It is part of the claim that was made below. There was a claim below that the rent was not yet due and that there was no breach of the lease. And while I will certainly concede on appeal, the argument's focus is different. It's simply a different focus of argument. The claim was there below, and it was an alternative one. It wasn't weighed under cases like LeBron or Yee or this Court's decisions in Koch and Woodruff. It's an important document. And in that document, the parties, the landlord withdrew its prior defaults. The parties committed to terminating the escrow agreement and causing $525,000 go to the landlord. That happened. They set a new date for the payment of the bulk of the rent, which was to be 90 days after the Second Amendments were signed. And they committed themselves to further negotiate. It said, quote, the timetable for development will be revised and documented in amendments to the development agreement. That's where they stood. They worked on that, but come May of 2013, they'd failed to complete that process. Now, May of 2013, three years after the signing of this lease, with 96 years left to go, the market had improved. The landlord demanded a rent payment that the tenant was not obligated to make under the lease and then purported to terminate the lease. Reviewing the facts in the light most favorable of the tenant, which we must do because this was below on a summary judgment motion, there was no rent due on May 30th. That's provided for under the term sheet, which is a binding agreement. Second, even if you conclude that rent was due on May 30th, because you ignore the term sheet, you're left with a world that had the original agreements between the parties, and the obligation was to make that second rent payment into escrow to deal with the environmental remediation that was necessary. Landlord didn't demand a payment be made into the escrow. Landlord demanded a payment be made to it. Moreover? My recollection is your brief says that the developer tried to contact the university about creating a new escrow and didn't hear back. But my recollection is that isn't much documented. But, Your Honor, again, we're on summary judgment, and there's an affidavit in the record below that indicates that the tenant reached out to the landlord to negotiate with regard to an escrow and that the university refused to do so. And on summary judgment, that has to be credited. You can have a trial to determine the effect of all those things, but at this stage of the proceeding, that has to be credited. Thirdly, with regard to whether there was a breach under the terms of an agreement, the agreement has a two-step process for notice. The first step is the landlord must give notice that rent is due. If 10 days pass without payment, then there's a, quote, event of default. An event of default standing alone. I understand exactly what you're saying, but the difficulty is that in your opposition to the motion for summary judgment, you focused entirely on an arrangement for exactly this two-stage process that everyone seems to now agree is inapplicable. It's true that the portion that the provisions that people now agree are applicable also set up a two-stage process, only 10 days rather than 20 days. But you didn't brief that at all before the district court. Well, Your Honor, counsel below, and to be clear, it was not my law firm, but counsel below focused on a different section of the lease. That's true. And a different document altogether. And a different document. They said that the development agreement was pulled into the lease in effect. And that's not an argument we're pursuing here. Again, the key is the claim, though. The claim was the rent was not due. And, again, under a line of cases, LeBron, that I touched on before, the issue is what was the claim? You can make alternative arguments. You can make different arguments in the appellate court. LeBron, for example, the question was whether Amtrak was a government entity. That was the issue before the Supreme Court. In the Court of Appeals, they had argued it was a somewhat similar entity to a government entity. So the issue is the claim, and the claim is there, and it's preserved. The arguments, Your Honor, are different. I understand that. Now, finally, there's the question of forfeiture. Under D.C. law, which governs here, forfeiture is a harsh and disfavored remedy. The mere fact that the lease permits termination is not dispositive. Even though these are commercial parties, that is not dispositive. And cases such as Entrepreneur Limited versus Yasuna in D.C. say that. Instead, for forfeiture to be available, there must be a number of factors. There must be a breach of a clearly defined obligation. There must be no alternative remedy. The landlord must deal fairly, and there must be no prejudice to the landlord. Excuse me, there must be prejudice to the landlord. Here, none of those exist. So the grant of forfeiture by the district court was error. Gun v. Brown, to which the landlord has no answer, is dispositive. What that case basically says is, where the landlord is asked for rent, that is the alternative remedy as a matter of law. You can't ask for rent and also seek termination. It's a 1950 D.C. Court of Appeals, then Municipal Court of Appeals case, and it is dispositive. It sets forth what that alternative remedy is. In part, the trial courts seem to be mistaken in thinking about these as commercial entities and that changing the analysis. It doesn't. This whole body of law is developed in cases involving commercial entities. Translux is a parking lot. Shapiro, a commercial property. Entrepreneur, the issue is about a business. Again, with respect to the issue of the willfulness of the breach, the question is whether the rights were clearly defined. Here they were clearly not. We had a term sheet. We had questions about whether the amount was payable under ESCO or not. We had questions about the notice provision, which even the trial court admitted was murky, and counsel for landlord below, I believe the word they used was not careful, were murky. At the end of the day, also, there was no prejudice to the landlord. The landlord has received a judgment for the rent. The rent covers not only past time but future time. There's not another rent payment due for it. It's very complicated under the lease, but in essence for another year. I see my time is running short. Unless you have any other questions for me at this time, I'd like to reserve the balance of my time. Thank you. Thank you. May it please the Court. Timothy McCormick for Howard University. Your Honors, before you today, seeking the affirmance of this summary judgment, we are bound by the record below, and that record, which was undisputed, is that notwithstanding the document, first that this project began in 2008, notwithstanding the development agreement and the ground lease, notwithstanding probably what counsel would have preferred, beginning on March 31, 2011, these parties began modifying their agreement inconsistently with the loan documents. They did not require a written agreement to make changes to the transaction. That begins with the Howard University letter on March 31, 2011, extending the date for the second installment of rent, $1,475,000. It was already overdue at that point by the terms of the ground lease. The ground lease is that payment was due on March 15. The university agreed to extend that deadline December 8, 2011. For better or worse, the parties continued this practice throughout 2011 and into 2012, when on April 6, 2012, they entered into the term sheet the letter agreement, which was an agreement at most, an agreement to agree. Counsel today talks about the bulk of the rent being due 90 days after amendment agreements, which were never drafted, were signed. They were drafted. Well, Your Honor, a version was drafted. There were prior drafts before that. In fact, there were drafts that were contemporaneous with the termination of the escrow agreement, which the developer had refused to sign. But fundamentally, if we're going to go back, we really have only two choices. Either we accept that these parties orally made changes, which is the position that was taken below, because in the verified complaint, the developer states under oath rent was due May 30, 2013. Or we look to the documents, and those documents were going to be bound by that term sheet, as counsel would urge today. It required $100,000 to be paid 10 days after April 6, 2012. That was never invoked as an event of default. What was invoked as an event of default was a failure to pay the second installment of rent, which would be both of those two installments. I will acknowledge we acted consistently with what was the agreement of the parties, what the undisputed evidence below before Judge Howell showed was the agreement of the parties, which was that the university allowed that first installment to be wrapped back into the entire payment, that the parties agreed in February of 2013 that that payment would be made by May 30, 2013. We have the email from Mr. Schmoke and Mr. Siegel. You have the letters from Mr. Siegel acknowledging after the District of Columbia Preservation League came in that there was a payment due and beginning to make proposals for alternatives to a payment directly to the university. Which document is that? Mr. Siegel's letter, Your Honor. April 1? It relates to April 1, yes, Your Honor. In the record, Mr. Tarullo's affidavit states that a March 14 proposal was first made. There's reference again in the April 1, 2013 email from Mr. Siegel. So this is an email in which he says, The only monetary amount owed pursuant to Paragraph 11 of the Second Amendment is the initial ground lease payment roughly a million and a half. On or before May 30, as stated previously, we cannot agree that the university is entitled to collect that amount should the lease be terminated for nonpayment, particularly now that there is looming before us currently two historic preservation applications. That is his answer. And accordingly, as I stated in my March 7 email, respectively, these changes are non-negotiable. Yes. So is it your position that this reflects a completed agreement or that this does not? That this letter... It is my position, Your Honor, that for better or worse, orally the parties agreed on February 1, in a telephone call between Mr. Schmoke and Mr. Siegel, that the payment would be made on May 30. What nobody had anticipated was that six days later, the District of Columbia Preservation League was going to step in and for the first time seek historic designation for the old Bondbred Building. Right. The letter of April 1, is it really an email? I think it's really an email, right? Yes, Your Honor. The message, the email message of April 1, certainly seems to be something occurring in media's race where the parties are still negotiating, isn't it? Well, Your Honor, from the University's perspective, no. We had an agreement on February 1. I think that that letter and its tone... There was an oral agreement. There was an oral agreement. I think that tone reflects the history of this. The University has repeatedly reached agreements with this developer only to have him have it back away, seek amendments. The University has then given concessions. You know, the record below... As you said, both parties were broadsided by this historic preservation application, right? I don't know if broadsided is a word. I think both were surprised. But ultimately, it was the responsibility of the developer to resolve that issue. I mean, there were certainly methods by which to resolve it. But by 2013, this project had been at stand for six years. What was the University's response to this April 1 email message? It was that we were not unwilling. There's not a written response, no. It's another one. You didn't come back and say, well, sorry, we have an agreement. We made an oral agreement on February. I'm sorry, Your Honor. April 16, the University writes back and reiterates that the rent is due on May 30, 2013. Where is that? That is... I know it is in the Tirola affidavit, Your Honor, and I just do not have the citation to the... It's reproduced in there? Yes, it is, Your Honor. And the date on that again, I'm sorry? It would be April the 16th, Your Honor. On May the 23rd, the developer states its position very clearly that it will not make any more monetary payments to the University until such time as historic preservation issues are resolved. That seemed to be acceptable. Was that not acceptable to the University? That was not acceptable to the University. Its real estate had been tied up since 2008. It was entitled to the payment if the developer needed additional time. In fact, the deadline under the documents, because the parties had never reached agreement as to any amendments, the deadline for the completion of all construction, commercial and residential, was June 5, 2013. So the developer's position by May 23rd is that simply I'm not going to pay. I'm just refusing to pay. The developer's position below its sworn statement and its verified complaint is that rent was due May the 30th of 2013. There's no question it wasn't paid. As to the issues of notice, they might be more persuasive had the developer ever performed. It never paid the University the $1,475,000. Its agreement with its title company was one-sided. Only the developer could instruct the title company to release the money. There was no provision for releasing it to the University. And, in fact, subsequently, after Judge Hall entered judgment, the developer directed the title company to return the funds to it. It passed it on to an affiliate. And so we again have an empty vessel in the form of the developer. Finally, as to the issue of forfeiture, the University will be prejudiced. The development agreement, it is undisputed, has expired by its own terms as of June of 2013. Not a shovel full of dirt has been turned. The developer has done nothing to develop this property. And to give them, they want at this point, an open-ended lease in which they never have to pay rent until such time as the parties come to terms on a new amended agreement since their last agreement has expired. That would be extremely prejudicious to the University. This comes closer to the Womata case. And the Smith v. Warren Builders, where the developer failed to proceed. Does the University think that it appropriately followed the procedures for termination here? Yes, it does, Your Honor. The agreement provides that there will be a 10-day notice  It does not provide a 10-day notice to the developer. The second 10-day notice is to protect a leasehold mortgagee, which would have been the party that would have, had they built anything and had they financed that, would have had a mortgage on the improvements and a mortgage on the lease. And they were the parties entitled to that second 10-day notice so that if the developer failed to act, they could step in and perform under the lease, which they had a right to do under the loan documents, except no leasehold mortgagee existed. There's no requirement that there be subsequent, that there be serial notices to the developer. The first notice told them they were in default. The second notice told them we intended to terminate. Any other questions? Thank you. Your Honor, we would ask that this Court affirm Judge Howell's grant of summary judgment. I'm sorry. I'm here at page 105 of the Joint Appendix. Prior to exercising any right to terminate, Landlord shall provide tenant and leasehold mortgagee with a written notice. You're saying this doesn't apply to the tenant? Page 105 of the Joint Appendix. Your Honor, the 105 where it talks about the second 10-day notice period, that is a notice that says to the leasehold mortgagee. That's who that is protecting. I mean, it says that, but it also says tenant. Just before each leasehold mortgagee, the word is tenant. But it also, the lease also provides that upon expiration of such 10-day period, if that unfold has not been carried, Landlord shall have the right in its sole option thereafter to elect to terminate the lease in all of the rights of tenant in or to the premises, and in such case. Right, and that assumes the notice has been given, right? That assumes that the first notice has been given, or the combined notice. There's nothing that says that second notice has to be serial as to anyone other than the leasehold mortgagee. The original notice that went, said this is a notice of your default, this is a notice of our intention to terminate. This provision conflates two different notices to terminate, one to the tenant and one to the, which can be coupled with the... And in the case of the leasehold mortgagee who will have lent, had they been to develop millions of dollars to build the improvements, and will want to protect that interest on that mortgage, and it needs the rights in the ground lease, they are entitled to serial notice. There has been a default, and we intend to terminate, and it hasn't been cured within the first 10 days, and we intend to terminate, and there are provisions in the ground lease and in the development agreement that would allow that party, that bank, to step in then and begin making the lease payments on the ground lease to preserve its collateral, which is actually going to be the mixed-use building. Except there was never a mortgagee, there was never any money borrowed, and there is no building. Any other questions? All right, thank you. Thank you. All right. Mr. Smerzinski, you have one minute remaining, and we'll give you another minute, so two minutes for... I appreciate it. Let me start with the question of event of default, which is where we just ended. The agreement provides that you don't have an event of default until there's been a failure to pay for 10 days after notice. Then, only then, can you give a notice that there has been an event of default, and that applies both to the tenant and any leasehold mortgagee, and it provides that upon the expiration of such 10-day period, referring to the immediately antecedent second notice, then, and only then, is the right to terminate. The university, as it tells the story, suggests that the extensions were only a result of its... or gifts by it. They weren't. There were disputes about delays. The record is replete with them, and on summary judgment, the record has to be read in the light most favorable to the tenant. These agreements to extend the dates were a result of negotiation to resolve prior delays caused by the university. With respect to the term sheet, we hear the phrase, agreement to a return turnaround, but this agreement is at least as mutual in terms of trading obligations as the one in East Bank, the D.C. Court of Appeals decision in East Bank. The parties signed this. The parties acted on the basis of it. Defaults were withdrawn. Amounts were released from escrow. There was still more work to be done, but there was partial performance of that agreement, and there was a mutuality of obligation. It's a valid binding agreement. With respect to the question of rent being due on May 30th, as we discussed in our reply brief at pages 6 to 9, those references were entirely in connection with the execution of the Second Amendment. It didn't happen, so there was no amount owed on May 30th. The complaint does not admit that. Finally, with regard to this February 1st phone call, it's disputed. We're on summary judgment. That can't be credited, and as we see, the parties continue to act after that by negotiating. Do we have the developer's account of that phone call? Your Honor, it's within the Siegel affidavit, which appears at 435 of the record, and it's paragraph 22 at page 442 of the joint appendix. And Mr. Siegel states, under oath, there was no discussion of item number 2 in Mr. Schmoke's email pertaining to payment of the $1.475 million. So that's absolutely a dispute of fact, and on summary judgment, the tenant's version of those affairs must be credited. Unless there are other questions from the bench, I assume my time is up. Thank you. All right. Thank you.
judges: Brown, Williams, Ginsburg